UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

PNC BANK NATIONAL
ASSOCIATION,

      Plaintiff,

v.                             CASE NO. 8:13-cv-1261-T-23AEP

PEACE CREEK PROMENADE,
LLC, et al.,

      Defendants.

_____/

## ORDER

      PNC Bank National Association sues (Doc. 1) to foreclose the lien on each of two mortgaged properties, and the parties stipulate (Doc. 53) to the foreclosures.  A November 3, 2014 order (Doc. 87) states that "[a]fter crediting the agreed valuation of $3,650,000.00" for the foreclosure sale of the first property (the Peace Creek Property), "the remaining unpaid indebtedness is $1,076,047.20."  On December 16, 2014, the second property (the Coldwell Property) was sold at a foreclosure sale.  PNC moves (Doc. 95) for a deficiency judgment against Peace Creek Promenade, LLC, the borrower, and James L. Teel, the guarantor.[1]  At a July 27, 2015 hearing to determine the fair market value of the Coldwell Property at the time of the

_____

[1] In accord with an April 3, 2015 order (Doc. 100), PNC's "Motion for Summary Judgment" is construed as a motion for a deficiency judgment.

December 16, 2014 foreclosure sale, PNC and Teel each presented the expert opinion of a qualified appraiser.

## DISCUSSION

Located south of Hickory Hammock Road and east of US Highway 27 in Lake Wales, Florida, the Coldwell Property comprises 43.14 acres, including between 33.29 (Def. Ex. 1 at 3) and 38.49 (Doc. 95-1 at 9) acres of usable land.  On December 16, 2014, the Coldwell Property was "used as a citrus grove."  (Doc. 95-2 at 2)  Although "not presently zoned," the "future land use classification for [the Coldwell Property] is 'High Density Multi-family' use."  (Def. Ex. 1 at 22)  The Coldwell Property is listed for sale by Sperry Van Ness for $250,000.  (Doc. 112 at 71)

According to PNC, "the value of the Coldwell property was $190,000, as of December 16, 2014, which would leave a remaining balance of $886,047.20."  (Doc. 95 at 2)  Teel challenges PNC's valuation and argues that "the fair market value of the Property was at least $1,445,000 on December 16, 2014."  (Doc. 118 at 9)  The vivid discrepancy in the parties' proposed valuation derives primarily from the parties' irreconcilable differences in determining the Coldwell Property's "highest and best use."  In other words, a determination of the Coldwell Property's highest and best use will resolve the discrepancy in valuation.

**1. Highest and Best Use**

In determining the highest and best use of the Coldwell Property, each party's expert considered with respect to each proposed use the legal permissibility, the physical possibility, the financial feasibility, and the maximum profitability. Christopher Starkey, PNC's expert, concludes that the highest and best use of the Coldwell Property is continued agricultural use; Robert D. Poynter, Teel's expert, concludes that the highest and best use is high-density residential use. Underlying these divergent conclusions is a disagreement over "whether in fact there's access to [US Highway] 27 or not, and then, secondly, whether there's in fact demand for apartment-type units today." (Doc. 112 at 8)

**A. Access**

Developing the Coldwell Property for high density residential use requires that the property has direct access to a "primary collector" road. (Doc. 114 at 2; *see also* Doc. 118 at 3) The parties agree that the Coldwell Property has direct access to Hickory Hammock Road but that Hickory Hammock Road fails to constitute a "primary collector" road. (Doc. 114 at 2; Def. Ex. 1 at 6) Thus, as Poynter admits, the $1,445,000 "value conclusion . . . assumes that additional access to US [Highway] 27 could be obtained for the subject." (Def. Ex. 1 at 6)

Citing Section 704.01(2), Florida Statutes, and *Messer v. Sander*, 144 So. 3d 566 (Fla. 1st DCA 2014), Teel argues for a statutory easement to US Highway 27. However, Section 704.01(2) states:

> Based on public policy, convenience, and necessity, a statutory way of
> necessity exclusive of any common-law right exists when any land . . .
> or portion thereof, which is being used or is desired to be used for a
> dwelling or dwellings or for agricultural . . . purposes is shut off or
> hemmed in by lands, fencing, or other improvements by other persons
> so that no practicable route of egress or ingress is available therefrom
> to the nearest practicable public or private road in which the
> landlocked owner has vested easement rights.

Teel admits the Coldwell Property's access to Hickory Hammock Road.  Thus, Teel

fails to demonstrate under Section 704.01(2) that the Coldwell Property, or any

portion of it, "is shut off or hemmed in."

Further, Teel's strained interpretation of *Messer* fails to establish a statutory

easement.  In *Messer*, a swamp divided the property and "shut off or hemmed in" a

large portion of the property from access to the nearest public road.  Thus, *Messer*

holds that, in order to access the public road from the blocked portion of the

property, the property owners are entitled to a statutory easement.  As PNC correctly

explains, "[t]he unusual factual situation in *Messer* is not present here."  (Doc. 114

at 4)

Also, Teel argues that an implied easement exists over the property of John

Wood, who sold a ten-acre "part of the [Coldwell Property] to the Coldwell

investors, in May of 2007."  (Doc. 112 at 93)  However, Section 704.01(1), Florida

Statutes, states that an implied easement "exists where a person has . . . granted . . .

lands to which there is no accessible right-of-way except over her or his land."

Because Hickory Hammock Road constitutes an "accessible right-of-way" to the

Coldwell Property, no implied easement exists over Wood's property.  Further, as PNC explains, "the warranty deed from Wood to Coldwell for the westerly part of the Coldwell property expressly extinguished any easement over Wood's land." (Doc. 114 at 5)  Accordingly, the Coldwell Property lacks access to a "primary collector" road and under the prevailing circumstances cannot be developed for high-density residential use.

Teel argues that, even if the Coldwell Property has no access to a "primary collector" road, the property "can be developed today (and could be on 12/16/14) as a single-family residential property." (Doc. 118 at 6)  However, Teel's written appraisal makes no attempt to value the Coldwell Property for single-family residential use. (*See* Doc. 112 at 139)  Rather, at the July 27, 2015 hearing Teel attempted — for the first time — to provide an alternative valuation.  In providing this valuation, Teel relied on comparable properties that, despite the instructions in the April 3, 2015 order (Doc. 100), Teel failed to disclose in his written appraisal. Further, to the extent that at the hearing he provided an alternative valuation, Teel failed to adjust the values for the pertinent differences (*e.g.* in location, access, or utilities) between each comparable property and the Coldwell Property.  (Doc. 112 at 114–15)  Thus, the record is insufficient to value the Coldwell Property for single-family residential use.

**B. Demand**

Even if the Coldwell Property had access to a "primary collector" road, Teel

fails to demonstrate that demand supports high-density residential use.  To establish

demand, Teel relies on Poynter's July 2015 survey of "1[,]953 apartments . . . within

two miles of the [Coldwell Property]," in which Poynter found "essentially a

hundred percent occupancy."   (Doc. 112 at 84)  However, as Poynter acknowledges,

his appraisal contains no analysis of Lake Wales's anticipated population growth.

(Doc. 112 at 132)  According to the analysis performed by PNC's expert, Starkey:

> [T]he population within five miles is projected to increase from 38,305
> to 40,543 between 2014 [and] 2019. The number of households is
> expected to increase by 850 . . . but only 33% of those households are
> projected to be occupied by renters. That means about 280 new rental
> units will be needed by 2019, a number that includes both apartments
> and rented houses.

(Doc. 114 at 5 (record citations omitted))

Poynter concedes that there are "potentially competing properties" near the

Coldwell Property.  (Doc. 112 at 129)  For example, Poynter states that Hunter's

Glen, which is "a planned unit development" "approximately a mile" north of the

Coldwell Property, "could potentially have 240 units."  (Doc. 112 at 129)  Also,

Poynter states that a "70.8 acre high-density multi-family parcel . . . is under

contract" within five miles of the Coldwell Property and that "the density envisioned

by the purchaser was in the realm of 280 to 420 units."  (Def. Ex. 1 at 27)  Finally,

Poynter mentions a property south of the Coldwell Property that is "about to break

- 6 -

ground" and that "will absorb 230 units" of demand.  (Doc. 112 at 87)  Thus, the

record confirms that the development of nearby properties for high-density residential

use satiates the anticipated demand in Lake Wales.

Also, Poynter concedes that analyzing the rental rates of nearby apartments,

which is a "very, very important part of" determining the per unit value of the

Coldwell Property, "was beyond the scope of [his] appraisal assignment."  (Doc. 112

at 141)  In other words, as PNC explains, Poynter "made no economic analysis of

whether the prevailing rental rates in this market would even justify building

apartments on the Coldwell property."  (Doc. 114 at 6)

Teel fails to demonstrate by a preponderance of the evidence that either access

or demand supports high-density residential use of the Coldwell Property.  For the

reasons explained by Starkey in his appraisal and at the hearing, "[c]ontinued use of

the property for agricultural is the only use that meets the four tests of highest and

best use, until the market warrants further development."  (Doc. 95-2 at 2)

## 2. Valuation[3]

In valuing the Coldwell Property, each expert relies on the "sales comparison

approach," which requires "looking at comparable transactions or relevant data

within the market in comparison to the subject property."  (Doc. 112 at 20, 91)

Starkey analyzes five comparable agricultural properties — four in Polk County and

---

[3] For the reasons explained earlier in this order, this valuation does not consider the comparable properties that Poynter used to provide an alternative valuation at the hearing.

one in Highlands County — to conclude that the Coldwell Property's value is $190,000. A review of Starkey's appraisal confirms that Starkey performed the necessary adjustments to account for the differences between each comparable property and the Coldwell Property. (*See* Doc. 95-2 at 10)

As Teel correctly states, "Although the average value of [the five comparable properties that Starkey] used . . . yielded a $5,905 per useable acre number, Starkey used $5,000 per usable acre. (Doc. 118 at 7) Teel argues that "[t]his simple act took $30,308.45 from [Starkey's] resulting value ($905 acres x $38.49 acres)." (Doc. 118 at 7) Starkey explains that his conclusion to value the Coldwell Property at $5,000 per usable acre is a result of "reconciliation":

> The final step in valuation is reconciliation of the analysis that has been performed. While we attempt to make the appropriate adjustments to all the sales, I believe it still requires some additional analysis in the reconciliation and that's the reason that I was at $5,000 per acre, not because I rounded down, or you know, looked at an average or anything.
>
> I looked at Comparable 1 being a listing at that time, gave less weight to it at the time of the appraisal. Also, looked at Comparable No. 3 with the water frontage not being quite as comparable, with the remaining sales indicating a price range from $4,484 per acre to $5,303 per acre, and that was the consideration that was given in the reconciliation at $5,000 per acre.

(Doc. 112 at 36)

Adding $30,308.45 to Starkey's $190,000 valuation compensates for the possibility that Starkey's reconciliation unnecessarily weighted any previously applied downward adjustment. Valuation of the Coldwell Property at $220,308.45 is

more than the Polk County tax appraiser's assessment of the market value at $207,418.  (Doc. 95-2 at 1)  Yet, this valuation is less than the Coldwell Property's listing price of $250,000, which as Starkey testified, had triggered "absolutely no inquiries" as of the date of the hearing.  (Doc. 112 at 71)

## CONCLUSION

Accordingly, PNC's motion (Doc. 95) for a deficiency judgment is **GRANTED**.  The clerk is directed (1) to enter a deficiency judgment in favor of PNC and against Peace Creek and Teel for $855,738.75, which is the balance of the debt owed to PNC after crediting $220,308.45 for the Coldwell Property; (2) to terminate any pending motion; and (3) to close the case.

ORDERED in Tampa, Florida, on October 13, 2015.

STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE